UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHRISTOPHER NASCIMENTO,                    :

        Plaintiff,                    :    NO. 1:08-CV-326

                          :

                          :    **OPINION & ORDER**

  v.                    :

                          :

UNIVERSITY OF CINCINNATI,                    :

        Defendant.                    :

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 35), Plaintiff's Memorandum in Opposition thereto (doc. 43), and Defendant's Reply Brief in Support thereof (doc. 44). For the following reasons, the Court GRANTS Defendant's motion (doc. 35).

## I. BACKGROUND

In this retaliation case, Plaintiff Christopher Nascimento, a Chemical Storekeeper 1 in the University of Cincinnati's Department of Chemistry, brings a claim against Defendant University of Cincinnati ("UC"), alleging he was discriminated against for his use of the Family Medical Leave Act ("FMLA") to care for his son and wife (doc. 2).

Plaintiff began his employment with UC in 2001; his position required him to assist laboratories in the preparation of materials for experiments, the storage of chemicals, the maintenance of records of chemicals used, and ensuring safety

protocols were followed (doc. 43).  In 2003, Plaintiff's son was diagnosed with autism, and Plaintiff needed time away from work in order to take his son to therapy and to help him adjust to transitions and other triggers that occurred on occasion (Id.). Dr. Peter Padolik, Plaintiff's supervisor at the time, permitted him to work a flexible schedule in order to care for his son without requiring the completion of leave forms (Id.).  In September 2004, Dr. Bruce Ault became Plaintiff's supervisor (Id.).  When Ault became Plaintiff's supervisor, he required Plaintiff to submit leave forms to him for approval and to check the box on the form indicating it was FMLA time he was requesting as applicable (doc. 35).  Plaintiff filled out the forms as Ault required (Id.).  In December 2004, Ault gave Plaintiff a formal reprimand for unauthorized absences, extreme tardiness, failure to complete tasks in a timely manner and lack of adequate communication with co-workers (Id.).

In June 2005, Plaintiff's wife was injured in an accident, and Plaintiff, needing time now to care for his wife, continued to fill out the leave forms, checking the FMLA box and submitting them to Ault (doc. 43).  Ault never denied Plaintiff leave time to care for his wife or his son.  However, in September 2005, Plaintiff was told by another staff member that this procedure was not the proper FMLA-leave procedure (Id.). Plaintiff contacted UC's human resources department and this was

confirmed: the proper procedure was to seek FMLA-leave approval from UC's Health Services Department, not Ault (Id.).[1]    On September 21, 2005, Plaintiff discussed this issue with Ault and Dr. Pat Limbach, the chair of the department and Ault's supervisor (Id.). According to Plaintiff, Limbach warned Plaintiff not to go outside the department for FMLA issues and that Ault was to be the decision-maker regarding Plaintiff's FMLA leave (Id.).

On September 27, 2005, Ault requested an administrative hearing regarding Plaintiff's work, claiming that Plaintiff had failed to clean Rooms 530, 514 and 514A, failed to remediate the citations noted in an audit released on July 8, 2005, and created a new hazard in room 516 (doc. 35). This hearing resulted in a three-day suspension (doc. 43). Plaintiff believed this was retaliatory for him using FMLA leave, and on October 31, 2005, Plaintiff filed a grievance against Ault with Limbach, which grievance Limbach denied (Id.).

The notification regarding the hearing notes that Ault had been asking Plaintiff to clean Room 530 for nearly a year

---

[1]  The Health Services Department did, in October 2005, certify Plaintiff's intermittent leave to care for his wife, retroactive to June 26, 2005, the date of her accident, and continuing to October 21, 2005 (Id.). In addition, Plaintiff was certified to take intermittent leave to care for his son's autism (Id.). Plaintiff claims that Ault angrily threw at Plaintiff the forms Ault was required to complete as part of this FMLA-leave certification process (Id.).

(doc. 30).    Room 530 was a classroom that Plaintiff had stored computer parts and other equipment in, but Ault wanted it ready for use as a classroom for the 2005 incoming freshman class (doc. 32).    Ault sent Plaintiff an email on September 2, 2005, noting that Room 530 was still unready for classroom use and giving Plaintiff until the start of the fall quarter to get the room ready (Id.).    Also in that email, Ault instructed Plaintiff to remediate Rooms 514 and 514A, which had been the subject of the audit released in July 2005 (Id.).    Apparently, the audit revealed a number of infractions and, as these were rooms Plaintiff was responsible for the upkeep on, Ault tasked Plaintiff with addressing the infractions (Id.).    It appears that the audit was released while Plaintiff was out on leave to care for his wife, and Plaintiff claims that he never saw the audit until the disciplinary hearing that resulted in his suspension (doc. 43).    Ault claims that he provided Plaintiff with a copy of the audit and that they had several conversations over the course of the summer regarding the infractions and need for remediation, including the September 2 email (doc. 32).    Plaintiff contends that he was not present during the time the infractions were caused and that he was being held responsible for work that should have been done by someone else during his FMLA leave (docs. 30, 43).    Ault notes that, while Plaintiff was at work intermittently during the summer because of the need to care for

4

his wife, from September 2 and for the following three weeks, during which time Ault specifically directed Plaintiff to ready Room 530 and remediate Rooms 514 and 514A, Plaintiff worked 98 out of a possible 112 hours and still failed to complete his assigned tasks (doc. 32).

After the disciplinary hearing, which was contentious, Ault decided it would be best if he no longer supervised Plaintiff and that a "fresh start" would be better (doc. 32). Consequently, in November 2005, Limbach became Plaintiff's supervisor (Id.). On April 20, 2006, Plaintiff did not report to work (doc. 35). Thus began a cycle that continued until the termination of Plaintiff's employment: Plaintiff would not report to work but would leave a voicemail message indicating he was not coming in; Defendant would send a letter demanding physician documentation regarding the need for leave and a return-to-work date; Plaintiff would provide something purporting to "cover" his absences, sometimes with a return-to-work date; Plaintiff would then not report to work on that date, and the cycle would begin all over again (docs. 35, 43). Except for a short period of time on May 26, 2006, Plaintiff did not ever return to work (Id.).

In May 2006, Plaintiff was certified to take FMLA leave for his own care,[2] from April 18 to June 19, 2006 (doc. 43). To

---

[2] Plaintiff continued to take intermittent leave to care for his son, and he was approved to do so through October 2006, or until his FMLA time ran out if that occurred sooner (doc. 30).

substantiate this leave request, Plaintiff ultimately submitted a note from a Dr. Flynn on June 15, 2006, which provided that Plaintiff had been treated for a variety of illnesses, that he could return to work on June 19, 2006, and that he would "periodically require time off work for follow-up appointments and treatments for asthma treatments (including self-treatments) periodically and as needed after his return date" (doc. 28). Plaintiff did not return to work on June 19, 2006, and on June 23, 2006 he sent a note from a Dr. Dryer stating that he was treated for an acute illness but could return to work on that very day, June 23 (doc. 35).  Plaintiff did not return to work on that day (Id.).

On July 7, 2006, Limbach sent Plaintiff a letter again requesting a return-to-work status note to substantiate his need for medical leave, to provide UC the first date of absence related to that medical condition and to provide an expected date of return (Id.).  That letter erroneously stated that UC had not received substantiation for absences since June 19 (Id.).  As noted above, Plaintiff had submitted some type of documentation

---

It appears that Plaintiff used some of this time for appointments and much of it for late arrivals due to his son's difficulty with morning transitions (Id.).  Plaintiff references Limbach's requests for documentation regarding these late arrivals implying that they are evidence of retaliation but, of course, without documentation Limbach would have no way of knowing whether Plaintiff was late to work because of his son's needs or because of some non-FMLA-approved reason.  Plaintiff's implication of retaliation here is not well taken.

relating to June 18-June 22, 2006, leaving June 23-July 7 unaccounted for.

On July 13, 2006, Limbach sent Plaintiff a letter informing Plaintiff that he was no longer eligible for FMLA leave because he had failed to work 1250 hours in the rolling twelve-month period and he had used all of the 480 hours of leave time provided for under the FMLA[3] (doc. 35). This letter also noted that Plaintiff's status had therefore been changed to unpaid medical leave pursuant to UC's Policy 21-04 and directed Plaintiff to provide physician documentation by July 20, 2006, substantiating the need for his absence and providing an expected return-to-work date (Id.). The letter noted that failure to do so would result in an administrative hearing with termination the likely result (Id.).

On July 17, 2006, Limbach notified Plaintiff that an administrative hearing had been requested because of his failure to document a need for medical leave (doc. 35). On July 18, 2006, Plaintiff sent an email to Limbach containing various notes from various sources, which Plaintiff contends "provided documentation that addressed most of the days he had missed since June 19, 2006" (doc. 43). These attachments were: an undated

---

[3]  See 29 C.F.R. §825.200, which provides that an eligible employee's leave under the FMLA is limited to a total of 12 workweeks–or 480 hours–during any 12-month period and allows employers to opt for a rolling 12-month approach.

note indicating that Plaintiff was seen at that office for an eye exam and had dilated eyes, with the return-to-work section blank; a bill from Cincinnati Dental Services dated July 17, 2006, 1:10 P.M., indicating an initial comprehensive dental exam was performed; a return-to-work certificate from a physician indicating that Plaintiff was under that physician's care from June 23, 2006 to July 3, 2006 for a nosebleed and that he could return to work on July 3, 2006; a note from a urologist dated July 5, 2006, indicating that Plaintiff was seen for a urological visit on that date and was to return in 30 days; and a note from Dr. Hines dated July 14, 2006, stating that Plaintiff was under that doctor's care from July 12, 2006 to July 14, 2006, and that he was to return to Dr. Hines on July 17, 2006, with no medical purpose listed and no return-to-work date provided (doc. 28).

On July 26, 2006, Plaintiff was notified that an administrative hearing had been scheduled and that he was charged with failure to document the need for medical leave (doc. 28). On July 29, 2006, Plaintiff requested a grievance hearing, alleging, among other things, that he was being retaliated against for using FMLA leave (doc. 43). On July 31, 2006, Plaintiff sent Limbach an email noting that he left Limbach a voicemail message that he would not be at work "due to illness" and that he had two upcoming medical appointments and a court date, for which he would need to miss work (Id.). At the

administrative hearing, Plaintiff provided additional documents. These included a note from Trinity School indicating that on June 27, 2006, Plaintiff met with the principal at 3:00 P.M. to discuss his son's enrollment; a bulletin from a funeral that occurred on June 27, 2006 at 10:00 A.M. and an obituary for the decedent; a note from Sleep Care Diagnostics indicating that Plaintiff was seen in that office on July 11, 2006 until 1:00 P.M. that day, with no return-to-work date indicated; a note from Dr. Hines that Plaintiff was under that doctor's care from July 12, 2006 to July 14, 2006 and was to return there on July 17, 2006; a note from a Dr. Leonard dated July 17, 2006, stating that Plaintiff could return to work on July 17, 2006, and noting that he had an upcoming appointment there on August 14, 2006; a note that Plaintiff had a dental visit on July 17, 2006, with a return-to-work date of July 18, 2006; a notice from the Domestic Relations Division of the Court of Common Pleas that Plaintiff was ordered to appear there on July 21, 2006 at 11:00 A.M.; a note that Plaintiff had a dental visit on July 25, 2006, with a return-to-work date of July 26, 2006; and a doctor's note stating that Plaintiff had been seen by that doctor on August 2, 2006, and indicating that he was to follow up in two weeks (doc. 28).

At the August 4, 2006 administrative hearing, Limbach requested that Plaintiff be removed from his position because Plaintiff had failed to provide documentation to substantiate the

need for ongoing medical leave, and the documents provided were
non-responsive to the multiple requests Limbach had made of
Plaintiff (doc. 35).  The day after the hearing, Plaintiff sent
the hearing officer a note from Dr. Flynn dated August 4, 2006,
stating that Plaintiff had been seen by her on that date and
that, while Plaintiff had "seemed to have recovered from the
illness that began in April...there was a relapse or down-turn
which began 6/19/2006" (doc. 28).  That note further stated that
Plaintiff still had not recovered, that a new problem developed
on July 5, 2006, and that Plaintiff could return to work on
August 9, 2006 (<u>Id</u>.).  Plaintiff had apparently told Dr. Flynn
that the various notes he had provided UC were not "good enough"
and Dr. Flynn drafted her note after reviewing those notes and
Plaintiff's FMLA paperwork (<u>Id</u>., doc. 35).  Plaintiff contends
that he did not provide this note from Dr. Flynn prior to the
hearing because, he contends, he was not instructed until that
time that he needed to provide a single document explaining his
medical condition and giving a return-to-work date (doc. 43).
Plaintiff did not return to work on August 9, 2006.  On that
date, the hearing officer issued a letter terminating Plaintiff's
employment effective August 23, 2006 (<u>Id</u>.).

Plaintiff filed this action on May 12, 2008 (doc. 1).
On August 15, 2008, Plaintiff amended his complaint, making
claims against UC for disability discrimination and retaliation

10

in violation of the Americans with Disabilities Act ("ADA") and
for retaliation in violation of the FMLA (doc. 2).  In response
to Defendant's motion to dismiss of October 10, 2008, the Court
dismissed without prejudice the ADA claims and any portion of
Plaintiff's FMLA retaliation claim related to leave taken to care
for Plaintiff's own health (doc. 15).  Therefore, the only claim
remaining is Plaintiff's FMLA retaliation claim as it relates to
the care of others (Id.).  Defendant moved for summary judgment
on that remaining claim, which motion is ripe for the Court's
consideration.

## II.  LAW AND ANALYSIS

Although a grant of summary judgment is not a
substitute for trial, it is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56; see also, e.g., Poller v. Columbia Broadcasting System, Inc.,
368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8
F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of
Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131,
1133 (6th Cir. 1992)(per curiam).  In reviewing the instant
motion, "this Court must determine whether the evidence presents
a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of  material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).  The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case.  See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the

12

existence of that material fact.  See Celotex, 477 U.S. 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).  Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits.  Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of his claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d

at 405, quoting <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989)(internal quotation marks omitted).  In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment.  See <u>McDonald v. Union Camp Corp.</u>, 898 F .2d 1155, 1162 (6th Cir. 1990).  The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party.  See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970); <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962).  Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion.  See <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute.  <u>See Matsushita</u>, 475 U.S. at 587.  The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

### A.  FMLA RETALIATION

In relevant part, the FMLA entitles an "eligible employee" to up to twelve weeks of leave during any twelve-month period "in order to care for the spouse, or a son, daughter, or

14

parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005). An employer may not discriminate or retaliate against an employee for taking FMLA leave. 29 U.S.C. § 2615(a)(2). In particular, an employer is prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c); Arban v. West Publ'g Corp., 345 F.3d 390, 403 (6th Cir. 2003).

A plaintiff may survive summary judgment on an FMLA retaliation claim by presenting evidence such that "a reasonable jury could conclude that [he] suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." Macy v. Hopkins County School Bd. of Educ., 484 F.3d 357, 365 (6th Cir. 2007). Here, Plaintiff has presented his case as a single-motive case. Consequently, the parties agree that McDonnell Douglas controls the analysis, meaning that Plaintiff must meet a prima facie showing of retaliation, which UC can rebut by adducing a legitimate, nondiscriminatory reason for its actions, which reason Plaintiff must then attack as pretextual. Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). This process is not formulaic and rigid, and the prima facie showing is not an onerous burden.

15

Bryson, 498 F.3d at 570-71.  However, if the employee cannot show that he suffered an adverse employment action because he took leave-or at least that his taking of leave was a "negative factor" in the employer's decision to discharge him-he cannot show a violation of the FMLA.  Pharakhone v. Nissan North America, Inc. 324 F.3d 405, 408 (6th Cir. 2003).

In retaliation cases, to establish a prima facie case a plaintiff must show that he engaged in a statutorily-protected activity; the employer knew of such activity; he suffered an adverse employment action; and a causal connection existed between the protected activity and the adverse employment action. Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 314 (6th Cir. 2001).  Here, the only prong actually in dispute is the last one.  UC argues that Plaintiff has not established that either his three-day suspension or his employment termination was causally connected to him taking leave to care for his wife and son (doc. 35).  Plaintiff, on the other hand, contends that he has met this prong because of the temporal proximity between the taking of leave and the suspension and because of "an ongoing pattern of retaliation" against Plaintiff after he requested leave leading to the termination of his employment (doc. 43).

### 1.   Causal Connection

To satisfy the fourth prong of his prima facie retaliation claim, Plaintiff must adduce evidence of a causal

16

connection between the protected activity (here, taking FMLA leave for his son and wife) and the adverse employment action (here, the three-day suspension and the termination of employment). See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). No dispositive factor is required to show the causal connection. For example, evidence that Plaintiff was treated differently from similarly-situated employees may suffice. Id. Also, acute temporal proximity standing alone, in some rare cases, can support an inference of causal connection, Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 524-5 (6th Cir. 2008), and, when greater time has elapsed between the two, temporal proximity coupled with other indicia of retaliatory conduct may support the causal-connection prong. Id. In short, Plaintiff is required to produce sufficient evidence to create an inference that the adverse action would not have been taken had he not taken FMLA leave to care for his son and wife. Id. Because the circumstances surrounding the three-day suspension and the employment termination differ, the Court treats each adverse action in turn.

### a. The 2005 Three-Day Suspension

Plaintiff contends that his three-day suspension was in retaliation for contacting UC Human Resources regarding FMLA leave (doc. 43). Specifically, Plaintiff claims that he was told by Limbach and Ault on or about September 21, 2005, not to follow

17

UC's procedures for obtaining FMLA approval (Id.). Plaintiff, in contravention of that mandate, nonetheless did follow UC's procedures by contacting UC's Human Resources Department, and Ault called for a disciplinary proceeding less than a week later (Id.). That hearing resulted in Plaintiff's three-day suspension (Id.). Plaintiff maintains that the temporal proximity supports a causal connection between his use of FMLA and his suspension (Id.).

Defendant, however, contends that the three-day suspension was the result of Plaintiff's failure to perform assigned tasks by the imposed deadline (doc. 35). Specifically, Ault had been directing Plaintiff since he became his supervisor in 2004 to clear and clean Room 530 so that it could again be used as a classroom for the incoming 2005 freshman class as opposed to a storage room for computer parts and other equipment (Id.). On September 2, 2005, with Room 530 still not cleaned, Ault sent Plaintiff an email discussing the condition of the room and directing Plaintiff to use the following three weeks to prepare the room so it would be ready before classes started again (Id.). The work was not completed within the deadline imposed, rendering the classroom unavailable for the freshman students in 2005 (Id.). In that same email, Ault instructed Plaintiff to remediate Rooms 514 and 514A, which had been the subject of the audit released in July 2005 (Id.). The

18

remediation of those rooms did not occur before the start of classes (Id.). Ault therefore requested an administrative hearing, which resulted in Limbach issuing Plaintiff's suspension (Id.).

First, UC denies any retaliatory motive underlying Plaintiff's suspension (Id.). Second, UC contends that Plaintiff has provided nothing supporting a reasonable inference of causation because, even accepting as true the allegation that Plaintiff was told by Ault and/or Limbach not to follow UC's FMLA request procedures but did so anyway, that incident occurred on or about September 21, 2005, nearly three weeks after Ault imposed the deadline to clean the rooms (Id.). UC notes that no inference of causation rises when the adverse employment action was considered before the employee engaged in the protected activity. (Id., citing Clark County School Dist. v. Breeden, 532 U.S. 268, 272 (2001)). UC argues that Plaintiff therefore cannot rely on the alleged mandate from Ault and/or Limbach that Plaintiff disregard UC's FMLA policy and any animus that resulted from Plaintiff nonetheless following UC's policy to support the causal-connection prong because "Ault simply carried out the consequences of [Plaintiff's] failure to clean the stockroom by the deadline imposed" (doc. 44).

The Court is persuaded by Defendant's argument. UC has presented evidence that Plaintiff was informed of the need to

19

clean the rooms at issue before classes resumed, and Plaintiff has offered nothing to refute that evidence. On the contrary, Plaintiff requested an extension until December 2005 in order to complete the assigned tasks, so he was clearly informed of the directive. The record supports a conclusion that UC had concerns about the lack of cleanliness of the rooms before September 21, 2005, when allegedly Ault and/or Limbach expressed concern, anger or animus regarding Plaintiff contacting Human Resources about his FMLA leave. Therefore, the Court finds that Plaintiff has not met his burden of showing a causal connection between the September 21, 2005 conversations and the September 27, 2005 request for an administrative hearing that resulted in Plaintiff's suspension. See, e.g., Sosby v. Miller Brewing Co., 415 F.Supp. 2d 809, 821 (S.D. Ohio 2005).

Plaintiff rests the causal prong of his prima facie case regarding his suspension on the temporal proximity between the September 21 conversations and the September 27 request for an administrative hearing (doc. 43). However, at various points in the record, Plaintiff also appears to insinuate that his suspension was retaliatory because he was being punished for failure to complete tasks during time he was on leave. As a bare insinuation, that fails to prove causation. In addition, Plaintiff has offered no evidence to refute Defendant's evidence that Plaintiff worked ninety-eight out of the scheduled one

20

hundred twelve hours during the first three weeks of September 2005, the time frame within which Ault directed Plaintiff to clean the rooms. Plaintiff was not able to clean the rooms while he was on leave, and UC does not claim otherwise. However, Plaintiff has offered nothing to counter the assertion that he was at work a sufficient amount of time to clean the rooms irrespective of his FMLA leave.

In short, Plaintiff has not produced any evidence sufficient to create an inference that he would not have received a suspension had he not taken FMLA leave to care for his son and wife. <u>See</u> <u>Mickey</u>, 516 F.3d at 524-5. The record instead clearly supports the inference that he would not have received a suspension had he cleaned the rooms for which he was responsible by the imposed deadline.

**b.    The 2006 Termination of Employment**

Plaintiff contends that he has presented evidence of an ongoing pattern of retaliation that led to the termination of his employment (doc. 43). Specifically, Plaintiff alleges the following: (i) Ault made negative comments about Plaintiff's time away from work and made similar comments about another employee in the department, Mendralski, who took FMLA leave; (ii) Ault asked how Plaintiff's wife handled her work obligations and how

21

much time she was taking off to care for their son;[4] (iii) Ault threw Plaintiff's leave-request paperwork in Plaintiff's face on one occasion; (iv) Ault treated Plaintiff more harshly than other employees by taking disciplinary action against Plaintiff for failing to clean up messes while merely reminding Padolik that he needed to clean up after himself; (v) Limbach warned Plaintiff not to go outside the department for FMLA matters; (vi) Limbach accused Plaintiff of time-card fraud and threatened him with termination, which charge was dropped; (vii) neither Ault nor Limbach took any action to remove a fake job posting aimed at Plaintiff's leave time; (viii) Plaintiff was not given an office away from chemical vapors for his administrative work; (ix) Limbach ignored Plaintiff's requests for time off, which required Plaintiff to reschedule an appointment; and (x) Limbach "falsely accused Plaintiff" of not providing information regarding his time off to care for himself beginning June 19, 2006 (Id.).  To support these allegations, Plaintiff primarily presents his deposition testimony (Id.).

---

[4]  The Court notes that Plaintiff, in his response to Defendant's motion, states that "Ault asked Plaintiff how Plaintiff's wife handled her son's needs at her job" and cites Plaintiff's deposition for that allegation (doc. 43).  However, upon careful review of Plaintiff's entire deposition transcript, the Court finds that is not an accurate portrayal of Plaintiff's testimony.  Instead, Plaintiff clearly states repeatedly that Ault made those comments to Padolik, not directly to Plaintiff, and that Padolik told Plaintiff about those comments (doc. 30).

Defendant, on the other hand, asserts that these "perceived slights" do not amount to an ongoing pattern of retaliation (doc. 44).  UC contends that Plaintiff's employment was terminated because he failed to document the need for medical leave and failed to provide an expected return-to-work date and not in retaliation for Plaintiff's FMLA use (doc. 35).  UC specifically responds to two of the instances Plaintiff offers of actions amounting to an ongoing pattern.  UC argues that Plaintiff's attempt to use comments alleged to have been made by Ault to Padolik about Plaintiff's wife should fail because those statements are hearsay, and hearsay cannot be considered at the summary judgment stage (doc. 44, citing Wiley v. United States, 20 F.3d 222, 226 (6th Cir. 1994)).  In addition, UC argues that any comments allegedly made by Ault about Mendralski taking too much time off of work cannot be used to support a causal connection because Ault ceased being Mendralski's supervisor in 1997 and therefore had no idea whether Mendralski had used any FMLA leave prior to the time Ault allegedly made the comments (doc. 44).[5]

_____

[5] Defendant does discuss some of the other allegations raised by Plaintiff, but in its motion for summary judgment and in the context of whether those instances amount to adverse employment actions (doc. 35).  Because the standards for causal connection and adverse employment are different, the Court cannot simply import the analysis offered in the one context into the other.

Several of the instances proffered by Plaintiff do not, as Defendant notes, rise to the level of proof of an ongoing pattern of retaliation in the context of this claim. For example, even if Defendant did refuse to allow Plaintiff to move to another area to do his administrative work, Plaintiff has offered nothing other than his speculation to show that the refusal was given because of Plaintiff's FMLA leave to care for others, the only claim at issue here. The same is true with respect to Limbach's accusation of time-card fraud. In addition, Plaintiff's contention that Ault treated him more harshly than others does not rise to the level required to be proof of a causal connection. Sometimes, of course, evidence of disparate treatment can be used to support an inference of causation. Critically, however, such evidence is only helpful in the causation context when it relates to similarly-situated employees. See, e.g., Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir.1992)("to be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"). Here, Plaintiff has offered nothing other than his speculation that Padolik was merely reminded to clean up for

24

himself but, more importantly, he has offered no evidence at all that he and Padolik were similarly situated. On the contrary, the record clearly shows that they were not: Padolik is a PhD-trained research associate and manager of the freshman chemical laboratories who has reported to Ault for over ten years, while Plaintiff has completed some college, was one of five chemical store keepers and reported to a variety of individuals over his tenure with UC, Ault for approximately one year (docs. 30, 33). Cleaning the rooms was one of Plaintiff's designated job responsibilities (docs. 30, 43), while nothing in the record suggests that cleaning the rooms was one of Padolik's designated responsibilities. Plaintiff has simply failed to adduce evidence that he was treated differently than similarly-situated employees such that a reasonable inference of causation could be made. In addition, Plaintiff's assertion that Limbach "falsely accused Plaintiff" of not providing information regarding his time off to care for himself beginning June 19, 2006, is a characterization, not evidence. Indeed, a careful review of the record does not support that characterization. Finally, Plaintiff alleges that he was forced to cancel at least one medical appointment that he believes should have been FMLA-covered because Limbach failed to respond to his request for time off (doc. 43, doc. 30).[6] The

---

[6] The Court notes that Plaintiff insinuates that this was a pattern (doc. 43, "there were times when Limbach would simply ignore Plaintiff's request for time off"). However, the only

timing of the appointment and the wording of the email provided by Plaintiff suggest that this appointment was for Plaintiff's own care and not for that of his wife or son. Such an assertion does not support a causal connection between the termination of Plaintiff's employment and his FMLA use to care for his wife and son. In short, the Court does not find the foregoing allegations individually or in the aggregate supportive of an inference that Plaintiff's employment was terminated because he took FMLA leave to care for his wife and son.

However, given that the prima facie showing is not an onerous burden, Bryson, 498 F.3d at 570-71, the Court finds that the remaining incidents could, in the aggregate, support such an inference. As an initial matter, the Court is unpersuaded by Defendant's argument regarding Ault's comments to Padolik about Plaintiff. Beyond the bare assertion that his comments are hearsay, Defendant fails to explain how Ault's statements are hearsay. Of course, not every statement made to another person constitutes hearsay. Instead, only when a statement is made for the truth of the matter asserted do hearsay concerns get triggered, which does not necessarily appear to be the case here. See Ford v. Securitas Sec. Services USA, Inc., 338 Fed Appx. 483,

_____

evidence to support this is Plaintiff's deposition testimony and the email relating to one incident, an appointment originally scheduled for April 10, 2006 and rescheduled for April 28, 2006 (Id., doc. 30).

488 (6th Cir. 2009); Cf. Michael v. Caterpillar Financial
Services Corp., 496 F.3d 584, 598 (6th Cir. 2007)("witness
statements contained in an investigative report may be considered
on summary judgment 'not to prove their truth, ... but to
demonstrate the state of mind and motive of Defendant's managers
in discharging Plaintiff.'"). Consequently, the Court will
consider those statements. The Court notes that Ault and Padolik
both deny that those comments were made, while Plaintiff insists
they were. At the prima facie stage of the Court's analysis in a
summary judgment context, this type of "he said/he said" conflict
is best resolved in the plaintiff's favor, as a determination of
what actually was said involves a credibility analysis. In
addition, comments Ault may have made to Plaintiff about his time
off work or about Mendralski's FMLA time, although Ault denies
making any such comments, and Ault throwing FMLA-leave paperwork
in Plaintiff's face, although Ault denies doing so, could support
an inference that Plaintiff's use of FMLA leave to care for his
wife and son was a negative factor in the decision to terminate
Plaintiff's employment. Most compelling, however, is Plaintiff's
allegation that Limbach warned Plaintiff not to go outside the
department for FMLA matters. If Plaintiff's story is believed,
both Ault and Limbach indicated to him that he should not follow
UC's procedures for requesting FMLA time and that, instead, they
alone should field his requests. Again, both Ault and Limbach

deny making any such indication, but, again, at this stage, the Court errs on the Plaintiff's side.  If Ault and Limbach did indeed "warn" Plaintiff not to go outside the department, which warning Plaintiff did not heed, it is not unreasonable to see a link between Plaintiff having pursued FMLA leave through the proper procedures and Limbach's decision to ultimately terminate his employment.

In sum, the Court finds Plaintiff has met the minimal burden of a <u>prima facie</u> showing, and an inference can be made that his employment was terminated because of his use of FMLA time for wife and son.  However, the Court's analysis does not end here.

### 2. Legitimate Reason and Pretext

When a plaintiff successfully presents a <u>prima facie</u> case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions, which reason the plaintiff must then attack as pretext, a mask for the actual impermissible motive.  <u>Bryson</u>, 498 F.3d at 570.  Here, UC maintains that Plaintiff's employment was terminated because he failed to provide supporting documentation for the leave he requested pursuant to UC's Policy 21-04 and because he failed to provide UC with an expected return-to-work date (doc. 35).  UC's burden is one of production and not persuasion, and the reasons cited meet this burden.  <u>See Reeves v. Sanderson Plumbing</u>

Products, Inc., 530 U.S. 133.   In order to survive this motion
for summary judgment, Plaintiff must rebut this reason by showing
that it is pretext.   To do so, Plaintiff must show that UC's
stated reason had no basis in fact; did not actually motivate the
termination of his employment; or was insufficient to explain the
termination.   Manzer v. Diamond Shamrock Chems. Co., 29 F.3d
1078, 1084 (6th Cir. 1994).

          Although Plaintiff asserts that whether there was a
basis in fact for UC's stated reason is "hotly contested,"
Plaintiff has produced no evidence to support that assertion
(doc. 44).   On the contrary, the evidence that is in the record
clearly shows that Plaintiff did not produce an expected-return-
to-work date by the July 20, 2006, deadline imposed by Limbach,
nor did he do so by the August 4, 2006, administrative hearing
date.   Plaintiff had been warned that failure to provide such a
date could result in the termination of his employment, and UC
followed through on that warning.   Plaintiff refers the Court to
Collins v. United States Playing Card, 466 F.Supp.2d 954, 970
(S.D. Ohio 2006), asserting that the "same type of credibility
disputes are present here" (doc. 44).   The Court is not persuaded
by this attempt at analogy.   In Collins, the plaintiff was
disciplined for reading a newspaper article during work and for
leaving his work station early.   466 F.Supp.2d at 954.   He
asserted that he was on break while reading the article and that

29

he did not leave his station early.  <u>Id</u>.  The court found that the determination of which version actually happened required a credibility analysis, a jury function.  <u>Id</u>.  Here, in contrast, to counter UC's assertion that Plaintiff's employment was terminated because he failed to provide a return-to-work date and other documentation by the deadline imposed, Plaintiff has not claimed to have provided that information by the imposed deadline.  On the contrary, Plaintiff has admitted that he did not do so (doc. 30).  No credibility analysis is necessary here in order to determine what actually happened, and Plaintiff has produced no evidence showing that UC's stated reason for ending his employment had no basis in fact.

Plaintiff raises a number of other issues, each of which upon examination amounts to a red herring.  For example, Plaintiff claims that the fact that Limbach scheduled the administrative hearing before the deadline given for Plaintiff to respond indicates that "the decision was made and the die was cast" before the deadline passed (doc. 44).  Such speculation, of course, does not amount to evidence sufficient to defeat summary judgment.  <u>Lewis v. Philip Morris Inc.</u>, 355 F.3d 515, 533 (6th Cir. 2004)("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than

30

mere speculation, conjecture, or fantasy" (internal quotation marks and modifications omitted)).

      Similarly, Plaintiff attempts to create a material issue of fact by noting that nothing in Policy 21-04 mandates termination of employment when an employee does not provide the required documentation (doc. 44). Indeed, Plaintiff contends that Defendant violated its own policy, which, if true, could support an inference of pretext (<u>Id</u>., citing <u>Wells v. New Cherokee</u>, 58 F.3d 233, 236 (6th Cir. 1995)). Policy 21-04 states in relevant part that if the employee "cannot furnish a probable date for return to work, the employee shall receive Disability Leave" (<u>Id</u>.). Plaintiff argues that because he did not furnish such a date, he should have, pursuant to the policy, received Disability Leave, and terminating his employment was a violation of the policy. Plaintiff's spin on the policy is not well taken. The policy explicitly states that Disability Leave is contemplated when the employee "cannot" provide a return to work date. Here, Plaintiff offered nothing to UC and nothing in the record to show that he <u>could</u> not provide a return to work date, merely that he <u>did</u> not. The policy does not say that an employee is entitled to disability leave if he "does not" provide a return to work date–only if he "cannot." Plaintiff's interpretation of the policy conflates those two distinct concepts.

In addition, Plaintiff contends that the policy is ambiguous and should be construed against UC (doc. 44). To support this contention, Plaintiff notes that the policy "merely provides that an employee will be granted a leave only if he can provide a probable date of return to the same or a similar position" (Id.). He argues that UC's position, that the policy requires the employee to substantiate the need for ongoing leave, is not supported by the language of the policy, leaving the policy ambiguous (Id.). He then contends that his behavior was reasonable because he submitted "doctor's notes and excuses on July 14 and 18, 2006, [and] no one notified him that UC was looking for the information in a different form" (Id.).

The Court is not persuaded by Plaintiff's attempt to create ambiguity where none exists. Plaintiff is correct that the policy does not use the phrase "substantiate the need for ongoing leave." However, this does not mean that the policy is unclear. On the contrary, the policy unambiguously speaks to a situation where a physical incapacitation prevents an employee from performing his duties, and the policy is clearly tied to the FMLA (doc. 28). No reasonable juror could interpret this policy as meaning that an employee is not required to provide evidence of the physical incapacitation. The Court notes that many of the notes provided do not, on their face, support a need for leave because of physical incapacitation. To the extent they speak to

32

medical issues, many of them provide an excuse for a discrete appointment, something that would not preclude an employee from coming to work. For example, dental appointments can be scheduled during non-work time. Even assuming that Plaintiff was unable to schedule his initial dental appointment at a time other than July 17 at 1:10 P.M., an afternoon appointment does not prevent an employee from working in the morning. The same is true for the urology appointment and the meeting with the school principal—neither of these provides UC with an understanding of why Plaintiff would need leave because he was physically incapacitated such that he could not perform his job. Similarly, the funeral, which Plaintiff presumably attended, does not serve as support for the claim that Plaintiff needed disability leave from work. In any event, as Plaintiff himself notes, the policy explicitly states that the leave may be granted only if evidence of the probable return-to-work date is provided (doc. 44). Plaintiff's July 14 and 18 "notes and excuses" indisputably do not provide that information. This was not a matter of UC belatedly informing Plaintiff that it needed the information in a different form, as Plaintiff contends; this was a matter of Plaintiff not providing the information in <u>any</u> form.

Plaintiff also argues that he has shown pretext because he ultimately provided the information UC requested but UC terminated his employment anyway (doc. 43). Specifically,

Plaintiff asserts that the note provided by Dr. Flynn on August 5, 2006, covered his absences since June 19, 2006, and provided an expected return-to-work date of August 9, 2006 (Id.).  In addition to the fact that this note was produced after the imposed deadlines, UC takes issue with the veracity of the note, as it contradicts earlier notes provided by the same doctor and by other doctors (doc. 44).  Plaintiff argues this is an issue of credibility for the jury (doc. 43).  Plaintiff is correct, of course, that issues of credibility are properly for the jury. However, credibility is not at play here.  Even if believed, Dr. Flynn's note does not alter the fact that Plaintiff did not provide by the deadlines imposed the information UC clearly and repeatedly requested.  Plaintiff's claim that he did not provide that note earlier because he didn't know that UC required a single note does not change the analysis here.  Defendant has produced evidence showing that Plaintiff was told repeatedly that he needed to provide documentation to support his leave along with a return-to-work date.  Even if the individual notes could be construed somehow to fulfill the need to support his leave, they do not fulfill the need to provide a return-to-work date. In any event, Dr. Flynn provided an expected return-to-work date in that note of August 9, 2006, and Plaintiff did not return to work on that date, just as he had failed to return to work on

34

every other return-to-work date provided since he began taking leave to care for himself.

In short, Plaintiff has failed to meet his burden of demonstrating that UC's stated reason behind its decision to terminate Plaintiff's employment was merely a mask for its true motivation, to wit, retaliation against Plaintiff for his use of FMLA time for his wife and son. He has presented speculation and conjecture as to UC's motivations and has asserted that his own motivations were pure, but nothing in the record serves to create a genuine issue of material fact regarding the basis for the termination of Plaintiff's employment. The Court has compassion for Plaintiff having to juggle multiple health problems within his family. But the record shows that Plaintiff exhausted his FMLA leave and failed to comply with UC's requirements for continued leave without pay, and Plaintiff has not produced evidence creating a genuine issue of fact otherwise. Consequently, the Court must grant Defendant's motion.

**CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS Defendant's Motion for Summary Judgment (doc. 35) and DISMISSES this case from the Court's docket.

SO ORDERED.

Dated: July 28, 2010            /s/ S. Arthur Spiegel            
                                S. Arthur Spiegel
                                United States Senior District Judge

35